J-S66006-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| AKEEM KEVIN WASHINGTON | |
| Appellant | No. 2258 MDA 2015 |

Appeal from the Judgment of Sentence October 30, 2015
In the Court of Common Pleas of Lancaster County
Criminal Division at No(s): CP-36-CR-0000862-2015

BEFORE:  BOWES, PANELLA AND JENKINS, JJ.

MEMORANDUM BY BOWES, J.:                    **FILED DECEMBER 13, 2016**

Akeem Kevin Washington appeals from the judgment of sentence of twenty-five and one-half years to sixty years imprisonment that was imposed after he was convicted of three counts of solicitation to murder three police officers.  We affirm.

The pertinent facts follow.  On December 28, 2014, Lancaster City Police Officers Gregory Berry and Erik Pannone were on patrol when their attention was drawn to a commotion in the parking lot of Yorgos Restaurant, Lancaster, and they observed the doorman, James King, point to an unidentified man and signal for aid.  Officer Berry approached the unknown male while Officer Pannone asked for identification from Appellant, who refused that request in a profane manner.  Officer Pannone then requested

that Appellant remove his right hand from his pocket, and Appellant, again using vulgar language, ignored that demand. Officer Berry overheard Appellant's remarks and reiterated the command to Appellant to take his hand from his pocket. Appellant swore at Officer Berry and said that he would not comply with that directive.

After Officer Berry grabbed Appellant's right wrist in order to extricate his hand from the pocket, Appellant began to struggle with him. Officer Pannone deployed his taser, which did not affect Appellant. Appellant charged at Officer Berry who employed a strike to the neck designed to stun a person and swept Appellant's legs out from under his body. Appellant was arrested, but continued using expletives and resisting the police.

Due to Appellant's size, Sergeant Philip Berkheiser had been called to assist his fellow officers and met Officers Berry and Pannone in the police station's garage. Sergeant Berkheiser recognized Appellant from a previous arrest. He informed the other two officers to be careful as Appellant had previously harmed his girlfriend, nearly killing her. Appellant then threatened the sergeant. After Appellant was placed in a holding cell at the police station, he again made an intimidating remark to Sergeant Berkheiser. A separate criminal action was filed against Appellant charging him with offenses arising from his interaction with the three police officers at the parking lot and police station.

The offenses at issue in this criminal case occurred after Appellant was processed at the police station and remanded to the Lancaster County jail. Records from the prison established that Appellant was placed in the same cell as inmate Treymayne Jones, who confirmed that fact at trial. The two men had a number of conversations on December 28, 2015, and December 29, 2015. Appellant was angry about the "way he was arrested, how he was arrested[.]". N.T. Trial, 8/10/15, at 107. Specifically, Appellant was upset about being tasered and falling on the ground after Officer Berry swept his feet out from under him. *Id*. at 117. Appellant also accused the officers of brutality and decided to exact revenge by killing Officer Pannone, Officer Berry, Sergeant Berkheiser, and Sergeant Berkheiser's family.

Due to the alarming and continuing nature of Appellant's threats against the three officers, on December 29, 2015, Mr. Jones went to prison authorities. He gave two executed statements to police, one on December 29, 2015 and the other one on December 31, 2015. Those written and adopted statements by Mr. Jones specifically delineated Appellant's statements to Mr. Jones while they were in the cell together.[1]

_____

[1] At trial, Mr. Jones was unable to remember what he told police; consequently his two statements were introduced as substantive evidence. Appellant made no objection to the admission of these statements. Even though he could not recall what he told police, Mr. Jones repeatedly avowed that he would have been truthful with them. Additionally, Mr. Jones did remember that Appellant "threatened to kill three police officers[.] I definitely recall that." *Id*. at 167.

On December 29, 2015, Mr. Jones approached Correctional Officer ("CO") Matthew Bodley and "said he had a problem and he said that what should he do if his cell mate was trying to get him to kill a bunch of cops." N.T., 8/11/15, at 213. CO Bodley took Mr. Jones to an interview room and obtained the December 29, 2015 executed statement. Lancaster County Detective Thomas Ginder took Mr. Jones' second statement on December 31, 2015.

Mr. Jones told CO Bodley that Appellant said the following to Mr. Jones. Appellant had an incident with police at Yorgos Restaurant after he was refused entry into that establishment. Appellant said he was punched, kicked, and tased by Officers Berry and Pannone. *Id*. at 239. Appellant then stated "that he was going to kill both officers when he got out and he wanted [Mr. Jones] to help him." *Id*. Appellant instructed Mr. Jones to "make an anonymous call to lure the two officers" to an isolated area and then Appellant "would 'chop the car up,' meaning shooting it with a high-powered automatic rifle in the streets." *Id*. at 240.

Appellant also planned to kill Sergeant Berkheiser. Appellant reported that he told "the sergeant, he was going to f____ him up," which was consistent with Sergeant Berkheiser's testimony. *Id*. Appellant explained that "he could wait for the sergeant to get off and follow him home and nobody would ever know," and that "he has multiple gun charges on his

record[.]" *Id*. Appellant also informed Mr. Jones that he had access to two automatic rifles.

Mr. Jones reported to CO Bodley that he believed that Appellant would and was "very capable of doing it," *i.e.*, murdering the police. *Id*. at 241. Mr. Jones concluded that Appellant was not "just venting because he spoke about [killing the three officers] multiple times during the course of two days." *Id*. at 242. Appellant enlisted Mr. Jones' help in his plan because he knew that Mr. Jones was not from Pennsylvania and "no one would even know" Mr. Jones. *Id*.

Mr. Jones' December 31, 2015 statement was similar in nature. Mr. Jones informed Detective Ginder that, when Appellant arrived in the cell on December 28, 2015, he was "aggressive, hostile, angry, [and] bitter" because police had physically abused him. *Id*. at 250. Mr. Jones gave Detective Ginder a detailed statement made to him by Appellant about the events at Yorgos Restaurant and the police station, and Mr. Jones's version matched those offered by the three officers at trial.

Mr. Jones then launched into a description about Appellant's scheme to kill the officers in question. Appellant had two separate plots, one involved Officers Berry and Pannone while the other one pertained to Sergeant Berkheiser. Regarding Officers Berry and Pannone, Appellant planned to have Mr. Jones place an anonymous call to the police station to "lure them to a dark area," when Appellant would "jump out and chop their car up." *Id*.

at 257. Mr. Jones also clarified to Detective Ginder that "chop their car up" was street jargon and meant "use a high-powered rifle to shoot into their vehicle." *Id*. Appellant explained that he could get Officers Berry and Pannone to enter an isolated area "where he knows they would be working that time of night." *Id*. Appellant indicated that he would be able to lure the officers to the desired location where he would be waiting because he was from Lancaster and "there are only a few specific cops that work that beat at that time of night and he has seen those officers a few different times." *Id*.

Appellant's scheme to kill Sergeant Berkheiser was different. Appellant wanted to follow "the sergeant home and shoot him in his driveway. And if his family came out, he was going to shoot them, too." *Id*. at 258. Appellant enlisted Mr. Jones' aid in the plot to kill the sergeant. Mr. Jones was supposed to ride in the car with Appellant so Mr. Jones could operate as a lookout. *Id*. at 259. Appellant told Mr. Jones that Appellant could access two assault rifles from his cousin and obtain two other guns from his wife's home. *Id*. at 260.

Appellant additionally felt that any charges arising from the incident at Yorgos Restaurant would be quickly resolved in his favor. He anticipated conducting the two attacks one week after he was released, and asked Mr. Jones to exchange telephone numbers with him. Since Appellant did not expect to be out of jail until January 9, 2016, while Mr. Jones would be released earlier, Appellant told Mr. Jones to "stay at [Appellant's] house until

they were able to do this, and then [Appellant] would hook him up with heroin to sell to get money, basically as payment for this act." *Id*. at 246. Appellant believed that he would be able to avoid apprehension since he knew Lancaster so well.

Mr. Jones told Detective Ginder that, while they were in the cell together, Appellant never stopped talking about the plans to kill the three police officers. Thus, over a two-day period, Appellant plotted his crimes day and night. Mr. Jones stated, "We never discussed women, never discussed clothes, places to eat. Our conversation was just about executing these officers." *Id*. at 262. Mr. Jones also reported that Appellant "is very competent. He knew what he was saying. He understood what needed to be done, how it needed to be done. His planning was thorough. It's crazy. He is intelligent." *Id*. at 263.

While Mr. Jones had heard other inmates threaten police, he did not take those statements seriously, but Mr. Jones believed that Appellant was resolute about his plot. Appellant took pride in his calculations and "was smiling. We talked a lot about it. He was very adamant about doing it. He thought the plan to follow the sergeant was a smart plan." *Id*. at 264. Mr. Jones came forward to police due to the credibility of Appellant's threats and his discomfort with including Sergeant Berkheiser's family among the proposed victims.

Police executed a warrant at the home of Appellant's wife and recovered a semi-automatic handgun. They were unable to search the home of any of Appellant's cousins since he had so many cousins in the area and Mr. Jones had not been given the name of the cousin with the assault rifles.

Based upon the above evidence, Appellant was convicted by a jury of three counts of solicitation to murder in connection with the police victims and was acquitted of solicitation to murder Sergeant Berkheiser's family. On October 30, 2015, Appellant was sentenced to twenty-five and one-half to sixty years in jail. On appeal, Appellant raises these contentions for our review:

> I. Did the trial court err in refusing to grant a mistrial after Detective Thomas Ginder read the portion of Commonwealth witness Tremayne Jones' written statement in which he claimed that Mr. Washington stated he "has multiple gun charges on his record?"
>
> II. Did the trial court err in permitting the testimony of Officers Pannone and Berry and Sergeant Berkheiser, regarding Mr. Washington's actions in the early morning hours of December 29, 2014, which led to charges of disorderly conduct, terroristic threats, resisting arrest and public drunkenness, where the Commonwealth had elected not to consolidate the charges, and this detailed testimony and the related video were prejudicial, not probative, and not needed for context or "complete story," since the jury was aware of the charges, and the officers involved, through the statements and testimony of Tremayne Jones?
>
> III. Did the trial court err in refusing to permit defense counsel to impeach Tremayne Jones regarding his prior drug charges after Mr. Jones volunteered that he had "never been arrested for any kind of drug, anything in my entire life?"

Appellant's brief at 6.

Appellant's first complaint is that he should have been granted a mistrial after the contents of Mr. Jones' statement indicated that Appellant had multiple gun charges. When Mr. Jones' statements suggested that Appellant had pending weapons charges against him, Appellant objected and sought a mistrial. The trial court denied the mistrial, but immediately gave the jury a strongly-worded curative instruction: "I am directing you to disregard the comment about multiple gun charges; and I can tell you, in fact, he does not have any multiple gun charges on his record, so you are to disregard that. It is not a statement that you are to consider. In fact, that is an inaccurate statement." N.T. Trial, 8/11/15, at 242. Thus, there was an unequivocal directive to ignore the report that Appellant had weapons charges and a twice-repeated declaration that the statement was false.

We have observed that a "declaration of a mistrial serves to eliminate the negative effect wrought upon a defendant when prejudicial elements are injected into the case or otherwise discovered at trial." **Commonwealth v. Tucker**, 143 A.3d 955, 961 (Pa.Super. 2016). Therefore, "the trial court is vested with discretion to grant a mistrial whenever the alleged prejudicial event may reasonably be said to deprive the defendant of a fair and impartial trial. In making its determination, the court must discern whether misconduct or prejudicial error actually occurred, and if so, assess the degree of any resulting prejudice." **Id**. This Court's review of the resolution

of a mistrial request is limited to "determining whether the court abused its discretion." *Id*. In this case, we find that any prejudice inuring to Appellant was eradicated by the instruction in question, and the trial court did not abuse its discretion in refusing Appellant's request for a mistrial.[2]

Appellant next complains about the fact that Officer Berry, Officer Pannone, and Sergeant Berkheiser were permitted to testify at trial. They delineated what transpired in the parking lot at Yorgos Restaurant and the police station. "It is well-established that the admissibility of evidence is within the discretion of the trial court, and such rulings will not form the basis for appellate relief absent an abuse of discretion." *Commonwealth v. Hoover*, 107 A.3d 723, 729 (Pa. 2014).

Herein, proof about the events in the parking lot and the police station was limited to establishing how Appellant came to know the identity of the officers whom he threatened and his motive for wanting them murdered. N.T. Jury Trial, 8/10/15, at 49-53. Before the three police officers testified as to the events surrounding Appellant's arrest, the jury was given a clear limiting instruction. Specifically, the trial court informed the jury that the proof was being offered for a "very, very limited purpose. It's providing some context within which you can evaluate the charges that are in this

---

[2] We observe that Appellant preserved his present contention by stating at trial that he did not believe that a curative instruction would obviate the prejudice flowing from the false report.

- 10 -

case." N.T. Jury Trial, 8/11/15, at 280. The trial court told the jurors quite plainly that the crimes committed at the parking lot and police station "are not presently before you." *Id*. It continued, "I want to make sure you understand this. This is of utmost importance, and the law does not allow you to infer guilt because of these other charges." *Id*. at 281. The court additionally stated, "You are not dealing with those [charges]. Those are not for you to address." *Id*.

Appellant maintains herein that the testimony by the three officers was cumulative and repetitive. He notes that the statements given by Mr. Jones included Appellant's rendition of the events at Yorgos Restaurant and the police station. Appellant maintains that this proof would have been sufficient to establish motive and how Appellant could identify his proposed victims. However, we find that the officers' proof was not excludable from evidence on the ground that it was cumulative and repetitive to the contents of Mr. Jones' statements to police.

The officers' description about the incident at the Yorgos Restaurant and the police station corroborated what Mr. Jones told police. When Mr. Jones detailed to police what Appellant told him about the events surrounding his arrest, it correlated, with the exception of the occurrence of police brutality, exactly with the testimony of the officers. Therefore, Mr. Jones' two statements to police were rendered more credible. The testimony of the police demonstrated that Appellant had been speaking to Mr. Jones

about the three officers and events surrounding his arrest and that Mr. Jones was not fabricating his story to cull police favor. We therefore reject this allegation of error.

Appellant's final position is that the trial court erred in refusing to allow him to impeach Mr. Jones with prior drug convictions. "The scope of cross examination is a matter within the trial court's discretion and will not be disturbed by this Court absent an abuse of that discretion. An abuse of discretion is not a mere error in judgment but, rather, involves bias, ill will, partiality, prejudice, manifest unreasonableness, or misapplication of law." **Commonwealth Hoover**, 16 A.3d 1148, 1150 (Pa.Super. 2011). The extent to which Appellant was going to be able to impeach Mr. Jones was examined prior to trial. The trial court ruled that Appellant could only cross-examine the witness with prior *crimen falsi* and not such matters as drug offenses.

On appeal, Appellant suggests that Mr. Jones opened the door to the questioning about his drug convictions because he denied having any. The fatal flaw with this position is that the Commonwealth never initiated such an inquiry. Rather, Appellant began to ask Mr. Jones about his drug use and drug offenses while cross-examining that witness. During that questioning, Mr. Jones denied having a serious drug problem with illicit drugs or being convicted of drug-related crimes. After these denials, Appellant asked Mr. Jones whether he was **arrested** for drugs in Nashville, Tennessee on April

23, 2011, and in Texas on May 25, 2011. N.T.Trial, 8/10/15, at 146. After the witness denied those arrests, Appellant did not offer extrinsic proof that they occurred. Instead, he moved on to whether he could impeach Mr. Jones with another crime and showed the court a newspaper article about that witness' arrest for a prostitution-related offense.

Furthermore, the jury was given extensive information about Mr. Jones' criminal activities. The jury was apprised that Mr. Jones was incarcerated with Appellant during December 2014 on misdemeanor charges, had been extradited while he was in jail in Texas to face those charges, and pled guilty to two misdemeanor offenses consisting of terroristic threats and disorderly conduct. N.T. Trial, 8/10/15, at 105, 139, 157, 159-60. That witness admitted that he was convicted in 2009 in California for receiving stolen property. Mr. Jones also acknowledged that, while he had family members who were police officers and his parents were law-abiding Christian citizens, he had chosen a life a crime. *Id*. at 132. It was evident that Mr. Jones had a significant criminal history in that he reported the following at trial: "I chose to make the decisions that I made, you know, outside, you know, of my family. Running the streets and breaking the law myself, those are the decisions that I made myself. So I was raised that way, but . . . I participated in, you know, in criminal activities. . . . " *Id*. at 132.

Regarding any prior drug matters, Appellant started this line of questioning, and thus, could not open to the door to such cross-examination

himself. He mentioned arrests, which may or may not have led to convictions. Finally, Appellant never tried to introduce extrinsic evidence that those arrests occurred. Under these facts, Appellant is not entitled to relief.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/13/2016